IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,                    :
                                             :
        Plaintiff,                           :
                                             :
             v.                              :
                                             :
$148,967.00 IN UNITED STATES                 :
CURRENCY; $45,000.00 IN UNITED               :
STATES CURRENCY; $25,060.00 IN               :
UNITED STATES CURRENCY;                      :
$14,303.00 IN UNITED STATES                  :
CURRENCY; $9,000.00 IN UNITED                :
STATES CURRENCY; $5,260.00 IN                :
UNITED STATES CURRENCY;                      :     CIVIL ACTION
$2,838.00 IN UNITED STATES                   :
CURRENCY; $1,445.00 IN UNITED                :
STATES CURRENCY; $1,086.00 IN                :
UNITED STATES CURRENCY;                      :     NO._____
$54,884.43 IN FUNDS SEIZED                   :
FROM BANK OF AMERICA ACCOUNT                 :
XXXXXXXX4760; $5,750.71 IN                   :
FUNDS SEIZED FROM BANK OF                    :
AMERICA ACCOUNT XXXXXXXX1751;                :
$3,759.23 IN FUNDS SEIZED                    :
FROM BANK OF AMERICA ACCOUNT                 :
XXXXXXXX1769; $71,016.23 IN                  :
FUNDS SEIZED FROM DELTA                      :
COMMUNITY CREDIT UNION ACCOUNT               :
XXXXXX5655; $36,312.28 IN FUNDS              :
SEIZED FROM DELTA COMMUNITY                  :
CREDIT UNION ACCOUNT XXXXXX4497;             :
$24,139.41 IN FUNDS SEIZED                   :
FROM DELTA COMMUNITY CREDIT                  :
UNION ACCOUNT XXXXXX6369;                    :
$8,429.25 IN FUNDS SEIZED FROM               :
DELTA COMMUNITY CREDIT UNION                 :
ACCOUNT XXXXXX8148; $7,780.51                :
IN FUNDS SEIZED FROM SUNTRUST BANK :
ACCOUNT XXXXXXXXX5485;                       :
$200,132.64 IN FUNDS SEIZED                  :
FROM WELLS FARGO BANK ACCOUNT                :
XXXXXX6830; $79,562.35 IN                    :
FUNDS SEIZED FROM WELLS FARGO                :

```
BANK ACCOUNT XXXXXXXXX5150;        :
$60,260.34 IN FUNDS SEIZED         :
FROM WELLS FARGO BANK ACCOUNT      :
XXXXXX9845; $30,828.70 IN          :
FUNDS SEIZED FROM WELLS FARGO      :
BANK ACCOUNT XXXXXX7390; 2011      :
LAND ROVER RANGE ROVER,            :
VIN SALMF1E42BA341598; 2011        :
HARLEY DAVIDSON FLSTC MOTORCYCLE,  :
VIN 1HD1BW515BB040308; 2010 HYUNDAI:
GENESIS, VIN KMHGC4DE7AU092202;    :
2008 INFINITI FX35,                :
VIN JNRAS08UX8X103144;             :
2007 CHEVROLET SUBURBAN,           :
VIN 3GNFC16067G287887; 2007 HYUNDAI:
VERACRUZ, VIN KM8NU13C27U007942;   :
2007 JAGUAR XKR,                   :
VIN SAJWA44C779B13134;             :
2007 MERCEDES BENZ GL450,          :
VIN 4JGBF71E47A190606;             :
2004 FORD F-250,                   :
VIN 1FTNX21P44ED68523;             :
2003 TOYOTA 4RUNNER,               :
VIN JTEBU14RX30014094;             :
2006 MIDNIGHT EXPRESS OPEN         :
VESSEL, HULL ID 37009,             :
WITH THREE 2006 MERCURY MOTORS,    :
SERIAL NUMBERS 1B258029,           :
1B256966, AND 1B245462; AND        :
ASSORTED COMPUTER EQUIPMENT,       :
                                   :
        Defendants.                :
```

## COMPLAINT FOR FORFEITURE

COMES NOW the United States of America, Plaintiff in the above-styled civil matter, pursuant to 21 U.S.C. §§ 881(a)(4) and (6), and files this Complaint for Forfeiture, showing the Court as follows:

1.

This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1345 and 1355, and venue is proper in this Court pursuant to 28 U.S.C. § 1395.

2.

On or about November 15, 2011, agents of the Drug Enforcement Administration ("DEA") seized $148,967.00 in United States currency ("the Defendant $148,967") and a 2008 Infiniti FX35, VIN JNRAS08UX8X103144 ("the Defendant Infiniti") from 5020 Guilford Forest Drive, Atlanta, Georgia; $45,000.00 in United States currency ("the Defendant $45,000") from 80 Mayflower Court, Dallas, Georgia; $25,060.00 in United States currency ("the Defendant $25,060"), a 2010 Hyundai Genesis, VIN KMHGC4DE7AU092202 ("the Defendant Genesis"), and a 2007 Chevrolet Suburban, VIN 3GNFC16067G287887 ("the Defendant Chevrolet") from 4684 Roswell Road, Atlanta, Georgia; $14,303.00 in United States currency ("the Defendant $14,303"), a 2007 Hyundai Veracruz, VIN KM8NU13C27U007942 ("the Defendant Veracruz"), and a 2003 Toyota 4Runner, VIN JTEBU14RX30014094 ("the Defendant Toyota") from 3697 Highway 5, Douglasville, Georgia; $9,000.00 in United States currency ("the Defendant $9,000") from 3324 Peachtree Road, NE, Unit 3012, Atlanta, Georgia; $5,260.00 in United States currency ("the Defendant $5,260") from 3325 Piedmont Road, NE, Suite 1701,

3

Atlanta, Georgia; $2,838.00 in United States currency ("the Defendant $2,838") from 684 Sixes Road, Holly Springs, Georgia; $1,445.00 in United States currency ("the Defendant $1,445") from 2327 Windy Hill Road, SE, Marietta, Georgia; $1,086.00 in United States currency ("the Defendant $1,086") and a 2004 Ford F-250, VIN 1FTNX21P44ED68523 ("the Defendant Ford") from 402 Argonne Terrace, Holly Springs, Georgia; a 2007 Mercedes Benz GL450, VIN 4JGBF71E47A190606 ("the Defendant Mercedes") from 3311 Highway 5, Douglasville, Georgia; and a 2011 Land Rover Range Rover, VIN SALMF1E42BA341598 ("the Defendant Range Rover"), a 2007 Jaguar XKR, VIN SAJWA44C779B13134 ("the Defendant Jaguar"), and assorted electronic equipment ("the Defendant Assorted Electronic Equipment") from 2302 Dryden Road, Houston, Texas, all within the jurisdiction and venue of this Court. On or about November 17, 2011, DEA agents seized $71,016.23 in funds from Delta Community Credit Union account number XXXXXX5655 held in the name of Olde Time Pharmacy Inc ("the Defendant $71,016.23"), $36,312.28 in funds from Delta Community Credit Union account number XXXXXX4497 held in the name of Olde Time Pharmacy Inc. ("the Defendant $36,312.28"), $5,750.71 in funds from Bank of America account number XXXXXXXX1751 held in the name of Sunrise Enterprises Inc., d/b/a Mountainview Pharmacy ("the Defendant $5,750.71"), $200,132.64 in funds from Wells Fargo Bank account XXXXXX6830 held in the name of Village

Pharmacy Inc. ("the Defendant $200,132.64"), $79,562.35 in funds from Wells Fargo Bank account XXXXXXXXX5150 held in the name of Village Pharmacy Inc. ("the Defendant $79,562.35"), $60,260.34 in funds from Wells Fargo Bank account XXXXXX9845 held in the name of Ajueyitsi Holdings Inc., d/b/a D & B Pharmacy ("the Defendant $60,260.34"), and $30,828.70 in funds from Wells Fargo Bank account XXXXXX7390 held in the name of Ajueyitsi Holdings Inc., d/b/a D & B Pharmacy ("the Defendant $30,828.70").  On or about November 18, 2011, DEA agents seized $54,884.43 in funds from Bank of America account XXXXXXXX4760 held in the name of Ajueyitsi Holdings Inc. D & B Pharmacy ("the Defendant $54,884.43"), $3,759.23 in funds from Bank of America account XXXXXXXX1769 held in the name of Sunrise Enterprises Inc., d/b/a Mountainview Pharmacy ("the Defendant $3,759.23"), $24,139.41 in funds from Delta Community Credit Union account XXXXXX6369 held in the name of Olde Time Pharmacy Inc. ("the Defendant $24,139.41"), and $8,429.25 in funds from Delta Community Credit Union account XXXXXX8148 held in the name of Richard Paul Noell ("the Defendant $8,429.25").  On or about January 13, 2012, DEA agents seized a 2011 Harley Davidson FLSTC Motorcycle, VIN 1HD1BW515BB040308 ("the Defendant Motorcycle") at 1433 West Loop South, Houston, Texas.  On or about January 20, 2012, DEA agents seized $7,780.51 in funds from SunTrust Bank account XXXXXXXXX5485 held in the name of Atlanta Counseling and Recovery

5

("the Defendant $7,780.51"). On or about January 26, 2012, DEA agents seized a 2006 Midnight Express Open Vessel, Hull ID 37009, and having three 2006 Mercury Motors, serial numbers 1B258029, 1B256966, and 1B245462 (collectively, "the Defendant Boat") from 827 Gulf Road, Surfside Beach, Texas.

3.

All of the above-listed Defendant properties are presently within the jurisdiction of this Court and are being held in secure locations or in a government account maintained by the United States Marshals Service.

4.

Since approximately October 2010, law enforcement officers, including DEA Task Force Officer William Manning ("Task Force Officer Manning"), have been investigating Better Living Wellness and Rehabilitation Center ("Better Living Center"), located at 3311 Chamblee Dunwoody Road, Chamblee, DeKalb County, Georgia, and Atlanta Counseling & Recovery Center ("Atlanta Counseling"), located at 4684 Roswell Road, Suite A, Atlanta, Fulton County, Georgia, each of which the officers believed to be operating as a "pill mill," that is, an ostensible pain clinic that illegally distributes controlled substances, including Oxycodone, via prescriptions.

5.

According to documents on file with the City of Chamblee, Georgia, Dr. Curtis Wills ("Wills"), a PhD of psychology and resident of Texas, is listed as the owner of Better Living Center and the type of business is listed as a counseling center, not as a pain clinic.

6.

According to documents on file with the City of Sandy Springs, Malcolm Dwayne Garrett ("Malcolm Garrett") and Dr. Darold Beard ("Beard") are the owners of Atlanta Counseling.

7.

From his investigation, Task Force Officer Manning learned that William Dean Benton ("Benton") is the actual owner of pain management clinics in Georgia and elsewhere, including but not limited to, Better Living Center, Atlanta Counseling, and at least three clinics in Florida.

8.

From his investigation, Task Force Officer Manning learned that Benton closed his Florida clinics as the result of an investigation by Florida DEA agents and agents with the Florida Department of Health, which led to the suspension of the medical and DEA licenses of the clinics' doctor.

9.

The investigation revealed that Better Living Center opened on or about October 2010 and that Atlanta Counseling opened on or about February 2011.

10.

From their investigation, agents later learned that Benton had contacted the patients from his Florida clinics and invited them to Better Living Center.

11.

From his investigation, Task Force Officer Manning learned that William Garrett ("Garrett") is a doctor who worked at Better Living Center and Atlanta Counseling and who wrote prescriptions for the clinics' patients.

12.

Task Force Officer Manning also learned that Beard is a doctor who worked at Atlanta Counseling from approximately February 2010 through on or about July 1, 2011.

13.

From his investigation, Task Force Officer Manning also learned that Richard Joseph Romero ("Romero"), who is Wills' stepson, worked at Better Living Center as the office manager and that Romero hired Beard as the doctor for Atlanta Counseling.

8

14.

Pursuant to 21 U.S.C. § 841(a), except as authorized, it is unlawful for any person to knowingly or intentionally distribute or dispense a controlled substance.

15.

Pursuant to 21 C.F.R. 1306.04(a), a physician can only issue a controlled substance prescription for a legitimate medical purpose, and a pharmacist filling that prescription has a corresponding responsibility to ensure that the prescription is for a legitimate medical purpose.

16.

On September 29, 2010, agents in the DEA's New Orleans District Office received a phone call from a representative of D&H Wholesale Medical, Inc. ("D&H") located in Ruston, Louisiana concerning an order that Garrett placed for 100 packages of 100-count Oxycodone 30mg (10,000 dosage units), 100 packages of 100-count Oxycodone 15mg (10,000 dosage units), and 100 packages of 50-count Endocet 10/325mg (5,000 dosage units).

17.

According to the representative, Garrett was not an established customer of D&H, and she had concerns about filling such a large order.

18.

On October 6, 2010, agents contacted the D&H representative and learned that the company decided against supplying Garrett with any controlled substances.

19.

The D&H representative stated that she had called Better Living Center to discuss the order, and an employee of the clinic told her that Garrett writes prescriptions for 180 dosage units of oxycodone for his patients as a one month supply.

20.

Because the D&H representative thought that the amounts Garrett was prescribing were excessive, she told the Better Living Center employee that D&H would not supply the clinic with controlled substances.

21.

In approximately October 2010, agents with the Georgia Drug and Narcotics Agency ("GDNA"), which is the agency that enforces Georgia's laws and rules pertaining to manufactured or compounded drugs and that ensures only licensed facilities and persons are distributing pharmaceuticals, began receiving complaints from pharmacists in Georgia and elsewhere regarding the large number of narcotic medication prescriptions written by Garrett that were being presented at their pharmacies.

22.

As part of his investigation, Task Force Officer Manning contacted GDNA agents and learned that there are various "red flags" that indicate a doctor is prescribing drugs for no legitimate reason, such as when the doctor prescribes the same prescription, i.e., 160 tablets of Oxycodone 30mg and 90 tablets of Oxycodone 15mg, to most or all patients at the same clinic.

23.

According to GDNA agents, pharmacists who continually receive the same prescriptions for numerous individuals that were written by the same doctor or from the same clinic will generally refuse to fill those prescriptions.

24.

From his training and experience and based on his investigation, Task Force Officer Manning believes that Better Living Center and Atlanta Counseling are acting as Drug Trafficking Organizations ("DTO") and actively takes steps to facilitate such illegal activity.

25.

From his training and experience, Task Force Officer Manning knows that all the states bordering Georgia have a Managed Prescription Program, which require pharmacists to record narcotic prescriptions in a state-wide database, with the individuals name,

the prescribing doctor, the date of prescription, and the drug and
drug strength.

26.

While similar legislation has been passed, Georgia's Managed
Prescription Program will not be operational until late 2012 or
2013. As a result, an individual can come from out of state and
see multiple Georgia doctors without alerting law enforcement.

27.

From their investigation, agents have learned that Better
Living Center and Atlanta Counseling, through Garrett and Beard and
on a daily basis, were prescribing Schedule II narcotics, including
Oxycodone, to customers who are mostly from out of state.

28.

The investigation revealed that patients from Florida,
Kentucky, North Carolina, Tennessee, and West Virginia would travel
from four to more than eight hours to get to Better Living Center
and Atlanta Counseling, passing hundreds of other medical
facilities along the way.

29.

From his training and experience, Task Force Officer Manning
knows that Florida, Kentucky, North Carolina, Tennessee and West
Virginia have a high degree of narcotic prescription diversion and
narcotic prescription abuse.

30.

The investigation also revealed that Garrett and Beard were regularly writing the prescriptions without a sufficient medical reason, that they were not performing sufficient medical examinations, and that they were prescribing pills in excessive quantities.

31.

Throughout their investigation, agents have interviewed various patients of Better Living Center and Atlanta Counseling, all of whom related essentially the same facts concerning their obtaining prescriptions at the clinics.

32.

The patients told the agents that after being unable to obtain pills from a legitimate doctor, the patients would visit Better Living Center and/or Atlanta Counseling, which they had discovered through friends.

33.

The patients brought an MRI to the clinics and would then be seen by either Garrett or Beard.

34.

During their visits, the clinic employees, including Garrett, Wills, and Beard, would conduct a limited examination, which lasted

13

as little as three minutes and involved mostly discussion, before giving the patients prescriptions for Oxycodone and other drugs.

35.

From their investigation, agents learned that cash is the only form of payment accepted at Better Living Center and Atlanta Counseling.

36.

Agents also learned that visitors to the clinics were charged $300 for a first visit and $200 to $250 for subsequent visits and that those fees did not cover the cost of narcotic medication that was dispensed on site.

37.

On November 22 and November 23, 2010, agents conducted surveillance outside Better Living Center, and they observed that the parking lot was very active with multiple vehicles containing multiple occupants coming and going.

38.

Agents also observed that occupants would move from their vehicle to a vehicle other than the one in which they had arrived at the clinic and that an overwhelming majority of vehicles at the scene displayed tags from Virginia, Kentucky, and Tennessee rather than Georgia.

39.

On November 23, 2010, at approximately 1:42 p.m. while conducting surveillance, DEA Task Force Officer Matthew Lawson ("Task Force Officer Lawson") observed a female employee, who was wearing what appeared to be scrubs and a white lab coat, exit the clinic and begin yelling at some men who were standing beside a Dodge truck parked across the street from Better Living Center.

40.

Task Force Officer Lawson could hear the female yelling that the men needed to either come inside the clinic or leave the area.

41.

Task Force Officer Lawson also heard the female tell the men that if they were patients, they needed to wait inside, and that if they were waiting for someone at the clinic, they needed to leave and return later.

42.

Task Force Officer Lawson also heard the female yell that people doing this is what got them shut down two years ago.

43.

On numerous occasions throughout the investigation, DEA agents acting in an undercover capacity obtained prescriptions for oxycodone 15 mg and oxycodone 30mg from Garrett or Beard without a

medical reason and with little, if any, medical examination by Garrett or Beard.

44.

For example, on March 1, 2011, Task Force Officer Chris Crutchfield ("Task Force Officer Crutchfield"), who had previously faxed a copy of his MRI and patient profile to Better Living Center, went to the clinic in an undercover capacity in an attempt to get an appointment to see the doctor as a pain management patient.

45.

Upon arriving at the clinic, Task Force Officer Crutchfield was greeted by Benton and a female nurse.

46.

Task Force Officer Crutchfield explained that approximately a month earlier, he had faxed the clinic his MRI and patient profile and that he made a follow-up call about three weeks earlier to ascertain the status of making an appointment.

47.

Benton asked Task Force Officer Crutchfield when he would like to make an appointment, and Task Force Officer Crutchfield replied, "Today, if at all possible."

48.

Benton asked one of the female employees to call "the other clinic" and told Task Force Officer Crutchfield, "I have two clinics, another one about five miles from here. I'll see if I can get you in there."

49.

Benton then asked where Task Force Officer Crutchfield was from, and Task Force Officer Crutchfield provided information from his UC profile.

50.

Benton asked if that address was in Georgia or Tennessee, because he had seen Tennessee plates on Task Force Officer Crutchfield's UC vehicle, and Task Force Officer Crutchfield explained that he was riding with a friend who was from Cookeville, Tennessee.

51.

Benton then told Task Force Officer Crutchfield that his appointment was at 12 o'clock, and he gave Task Force Officer Crutchfield a two-page MAPQUEST printout of directions to Atlanta Counseling.

52.

At approximately 11:52 a.m., Task Force Officer Crutchfield arrived at Atlanta Counseling.

53.

Task Force Officer Crutchfield was greeted by female staff member who handed him a new patient package of forms, including a questionnaire, to complete.

54.

The employee also asked Task Force Officer Crutchfield for his payment of $200 cash for the office visit.

55.

Task Force Officer Crutchfield answered all questions on the questionnaire, including questions related to his "pain level" using a scale of 1 to 10, and he did not list any "pain level" above 3.

56.

On the questionnaire, Task Force Officer Crutchfield listed many of his answers pertaining to pain as 0 (i.e., none).

57.

At approximately 12:22 p.m., before he had been seen by anyone other than the front office staff, Task Force Officer Crutchfield was called to the receptionist's counter and was given an appointment card for a follow-up appointment on March 29, 2011 at 10:00 a.m.

58.

The staff member was adamant that Task Force Officer Crutchfield must have this card in his possession when he returned on March 29 or he would not be seen.

59.

Task Force Officer Crutchfield also heard the staff member tell all other patients the same information when she handed them their appointment cards for the following month.

60.

Task Force Officer Crutchfield observed that all other patients were given their subsequent follow-up appointments before seeing the doctor.

61.

At approximately 12:41 p.m., Task Force Officer Crutchfield was called by a female nurse to the back.

62.

The nurse asked Task Force Officer Crutchfield various questions concerning his pain level and his goal for the treatment plan, and the entire interview lasted for approximately 2 and 1/2 minutes.

63.

At approximately 1:21 p.m., Task Force Officer Crutchfield was called to the back by Wills and entered his office.

64.

Wills and Task Force Officer Crutchfield began small talk, and Task Force Officer Crutchfield learned that Wills is 70 years old and had been a doctor for more than 40 years.

65.

Wills then made the statement, "Left shoulder discomfort" in referece to what Task Force Officer Crutchfield had put on his new patient questionnaire, and Task Force Officer Crutchfield replied, "Yes, sir."

66.

Wills then asked about how the injury occurred, and Task Force Officer Crutchfield said that it happened last summer when he was throwing the kids up in the air and into the water at the lake.

67.

During their conversation, Wills stated, "I never recommend surgery to a back," despite the fact that Task Force Officer Crutchfield's primary complaint was pain in his shoulder, not his back.

68.

During this interview, it appeared to Task Force Officer Crutchfield that Wills was simply making a rehearsed speech or reading from a book, asking general questions about whether Task Force Officer Crutchfield had any "psychological issues" and

"chemical issues" and discussing topics such as "social issues" and "social dependency."

69.

Wills then finished the interview, which lasted a total of approximately eight minutes, and said that he would put the file in Beard's door.

70.

Upon completion of the interview with Wills, Task Force Officer Crutchfield was instructed to sit in a chair in the hallway outside of Beard's office and across from Wills' office.

71.

As Task Force Officer Crutchfield was sitting in the seat, he looked up and saw a hidden camera, which was totally seated inside a recessed light in the ceiling in a concealed manner and pointed down on the seat.

72.

At approximately 1:46 p.m., Beard greeted Task Force Officer Crutchfield and had Task Force Officer Crutchfield enter his office to be seen for his exam.

73.

Beard interviewed Task Force Officer Crutchfield and performed a cursory exam.

74.

Beard told Task Force Officer Crutchfield that his problem could be solved with physical therapy and wrote down the name of an orthopedist for Task Force Officer Crutchfield to contact.

75.

Beard then handed Task Force Officer Crutchfield prescriptions for 90 Oxycodone 30mg tablets, 60 Gabapentin 800mg tablets, and 60 Naproxen 500mg tablets.

76.

Similarly, on April 5, 2011, Task Force Officer Ware, acting in an undercover capacity, met with Garrett at Better Living Center for a scheduled appointment.

77.

After a brief interview and a physical examination that lasted approximately 2 minutes, Garrett wrote Task Force Officer Ware prescriptions for 123 Percocet 10/325mg tablets, 60 Naproxen 500mg tablets, and 30 Carisprodol 350mg tablets.

78.

On June 1, 2011, Task Force Officer Ware returned to Better Living Center for an appointment with Garrett.

79.

During the visit, Task Force Officer Ware asked Garrett, "I was wondering if I could up the medications a bit. We were going

with Lortabs. I was wondering if we could go with Oxy 15s or 30s, something like that." Garrett replied, "We could do that."

80.

During the visit, Garrett did not perform any physical examination of Task Force Officer Ware, and he gave Task Force Officer Ware prescriptions 100 Acetaminophen 500mg tablets, 120 Oxycodone 15mg tablets, 60 Naproxen 500mg tablets, and 30 Carisoprodol 350mg tablets.

81.

As part of the investigation, Diversion Investigator Tanya Tyson submitted an ARCOS profile request form to the DEA, requesting the top 10 prescribers/purchasers for oxycodone and the brand name "OxyContin" in the state of Georgia from January 1, 2010 through January 1, 2011.

82.

On March 27, 2011, the DEA Targeting and Analysis Unit provided a spreadsheet ranking Garrett as the number eight (8) practitioner in the state of Georgia for oxycodone for the period of January 1, 2010 through January 1, 2011, with a total of 41,880 units prescribed.

83.

Because he had only been working at Better Living Center since September 27, 2010, the DEA records show that Garrett prescribed

those 41,800 units of oxycodone over approximately only three months.

84.

As part of his investigation, Task Force Officer Manning discovered that patients from Better Living Center and Atlanta Counseling were getting their prescriptions filled at various pharmacies in the Northern District of Georgia and elsewhere, including, but not limited to, D&B Pharmacy, Mountainview Pharmacy, Village Pharmacy, Olde Time Pharmacy, and Olde Time Pharmacy at Sixes.

85.

D&B Pharmacy is located at 3311 Highway 5, Suite D, Douglasville, Georgia.

86.

The Georgia Board of Pharmacy listed David Ajueyitsi ("Ajueyitsi") as the owner and Pharmacist in Charge at D&B Pharmacy.

87.

According to records on file at the Georgia Secretary of State's Office, Ajueyitsi is the CFO of Ajueyitsi Holdings, Inc., and Christian Monyei ("Monyei") of 609 N. Wall Street, Calhoun, Georgia, is the secretary of that company.

88.

GDNA agents reviewed various records for D&B Pharmacy and found that D&B Pharmacy was ordering and dispensing very high quantities of oxycodone.

89.

GDNA agents also found that D&B Pharmacy had filled over 1200 prescriptions for oxycodone 30mg and over 700 prescriptions oxycodone 15mg.

90.

GDNA agents reviewed the patient addresses and found that 95% of the oxycodone 30mg prescriptions and 96% of the oxycodone 15mg prescriptions that D&B Pharmacy filled were going to out-of-state customers, including customers from Alabama, Kentucky, Tennessee, and Ohio.

91.

GDNA agents also found that while D&B Pharmacy was filling prescriptions from multiple pain clinics, the largest number of prescriptions filled from Georgia pain clinics were prescriptions that had been issued by Garrett of Better Living Center.

92.

From their review of the records, agents found that D&B Pharmacy dispensed 315 prescriptions written by Garrett between October 2010 and February 2011, a period of only three and one half

months.   By comparison, from June 21, 2010 through February 24, 2011 (i.e., approximately eight months), D&B Pharmacy dispensed a combined total of 585 prescriptions for all other Georgia pain clinics.

93.

The records also revealed that the 315 prescriptions written by Garrett and filled by D&B Pharmacy between October 2010 and February 2011 generated sales for the pharmacy of $155,675.00.

94.

From their inspections at D&B Pharmacy, GDNA agents identified Ajueyitsi as the individual who filled the prescriptions written by Garrett.

95.

Mountainview Pharmacy is located at 2327 Windy Hill Road SE, Marietta, Georgia.

96.

On March 10, 2011, GDNA Agent Dennis Troughton ("Agent Troughton") conducted a routine retail inspection at Mountainview Pharmacy.

97.

The owner and Pharmacist In Charge, Uko Owu Ukoh ("Ukoh"), was present for the inspection.

98.

According to records on file at the Georgia Secretary of State's Office, Ukoh is the CEO and Registered Agent of Sunrise Enterprises, Inc.

99.

Agent Troughton reviewed various records for Mountainview Pharmacy and found that Moutainview Pharmacy was filling a large number of Oxycodone prescriptions for out-of-state customers.

100.

During the inspection, Agent Troughton observed and heard both Ukoh and Cletus Foma ("Foma"), a pharmacist who works part-time at Mountainview Pharmacy, refuse to fill oxycodone prescriptions, including prescriptions from customers who walked into the pharmacy as well as those who called on the phone, even though the pharmacy had the drug in stock.

101.

Agent Troughton questioned Ukoh and Foma about why they were not filling the pain clinic prescriptions that day, and Ukoh stated that the reason he was refusing the oxycodone pain clinic prescriptions was that if a patient had been coming every month to have them filled, he would fill them; if not, then he would refuse them.

102.

Foma stated that he did not refuse anyone that day, and when Agent Troughton stated that he had observed and heard Foma do so, Foma only repeated the question and said he did not.

103.

At approximately noon, Agent Troughton completed his inspection and left Mountainview Pharmacy.

104.

After leaving, however, Agent Troughton realized that there was another prescription record report that he wanted to obtain from Mountainview Pharmacy, and as a result, Agent Troughton returned to Mountainview Pharmacy arriving at approximately 3:30 p.m.

105.

Agent Troughton walked into the pharmacy and observed approximately five customers waiting in the front of the pharmacy to have their prescriptions filled.

106.

Ukoh let Agent Troughton into the pharmacy department, and Agent Troughton immediately observed four stacks of prescriptions on the front counter, either waiting to be filled or in the process of being filled.

28

107.

Agent Troughton observed that all of the prescriptions were from various pain clinics, and each stack included oxycodone prescriptions.

108.

Agent Troughton also observed that all of the prescriptions were for out-of-state customers.

109.

While leaving the pharmacy department after his second visit, Agent Troughton observed a male customer with prescriptions in his hand who was in the waiting area. Agent Troughton asked the man if he could speak with him about his prescriptions, and the customer agreed.

110.

The customer identified himself with a Tennessee driver's license in the name of "TC."

111.

TC stated that he suffered pain from old football injuries to his back and knee and that he had three prescriptions for 90 Oxycodone 30mg tables, 30 cyclobenzaprine 10mg tablets, and ES Tylenol that were written by Garrett at Better Living Center.

112.

TC further stated that this was the first time he had come to Mountainview Pharmacy and that the staff at Better Living Center had told him to come to Mountainview Pharmacy to get his prescriptions filled.

113.

TC also told the agents that he used to go to a clinic in Florida that was run by Benton and that he heard from a friend that Benton was running Better Living Center.

114.

Agents later reviewed the records Agent Troughton obtained from Mountainview Pharmacy and found that in the eight month period since it opened in June 2010, Mountainview Pharmacy had filled a total of 776 prescriptions for controlled substances, with 698 (i.e., 90%) for oxycodone.

115.

The records also showed that while Mountainview Pharmacy filled prescriptions from numerous pain clinics, it filled 246 prescriptions written by Garrett, generating total revenue of $147,829.64 for Mountainview Pharmacy.

116.

The records showed that from June 2010 through approximately February 2011, Mountainview Pharmacy dispensed 26,296 dosage units of oxycodone 15mg and 68,733 dosage units of oxycodone 30mg.

117.

The records also revealed that from June 2010 through approximately February 2011, Mountainview Pharmacy generated $77,051.44 from its sale of oxycodone 15mg and $277,070.82 from its sale of oxycodone 30mg.

118.

A review of the addresses listed in Mountainview Pharmacy's Daily Log Report shows that only 18 (2%) of the oxycodone prescriptions were for in-state patients and that the remaining 758 oxycodone prescriptions (98%) were for persons from other states including Tennessee, Kentucky, Ohio, and Florida.

119.

A review of the prices for the prescriptions showed that Mountainview Pharmacy was charging approximately $4 for each oxycodone 30mg tablet and approximately $2 for each oxycodone 15mg tablet, whereas most pharmacies usually sell oxycodone 30mg for approximately $1 per tablet.

120.

The records also show that Mountainview Pharmacy was paying significantly less for those drugs, paying, on average, $.29 for each oxycodone 15mg tablet and $.48 for each oxycodone 30mg tablet.

121.

The records also show that between June 2010 and February 2011, Mountainview Pharmacy increased the price it charged its customers for oxycodone 15mg from $1.03 to $4.00 per tablet and the price it charged for oxycodone 30mg from $1.50 to up to $8.00 per tablet.

122.

Olde Time Pharmacy is located at 402 Argonne terrace, Suite 230, Holly Springs, Georgia, and Olde Time Pharmacy at Sixes is located at 684 Sixes Road, Canton, Georgia.

123.

On March 9, 2011, GDNA Agent Michael Karnbach ("Agent Karnbach") conducted a routine pharmacy inspection of Olde Time Pharmacy.

124.

The Georgia Board of Pharmacy listed Richard Paul Noell ("Noell") and Shad Sutherland ("Sutherland") as the owners and Pharmacists in Charge at Olde Time Pharmacy and at Olde Time Pharmacy at Sixes.

125.

During the inspection, Agent Karnbach spoke with the pharmacist and discovered hundreds of controlled substance prescriptions filled and dispensed by Olde Time Pharmacy, most of which were for oxycodone, for patients who resided in other states, including Kentucky, Ohio, Tennessee, and Florida.

126.

The records at Olde Time Pharmacy showed that those prescriptions appeared to be paid with cash and without insurance.

127.

From his review of the records, Agent Karnbach estimated that more than 75 percent of the prescriptions filled for out-of-state patients were written by Garrett, despite the fact that Olde Time Pharmacy is located approximately 30 miles, or an estimated one hour drive, from Better Living Center.

128.

Agent Karnbach obtained pharmacy reports from January 1, 2010 through March 9, 2011 for the doctors who wrote the most prescriptions filled at Olde Time Pharmacy, and those records revealed that the physician with the most activity was Garrett.

129.

From their review of the records, agents found that Olde Time Pharmacy filled and dispensed 865 prescriptions written by Garrett

between November 5, 2010 and March 9, 2011, a period of approximately four months. By comparison, from January 1, 2010 through March 9, 2011 (i.e., approximately fourteen months), Olde Time Pharmacy dispensed a combined total of only 189 prescriptions for the other doctors whose records were reviewed, including 87 prescriptions written by Beard.

130.

The records also revealed that the 865 prescriptions written by Garrett and filled by Olde Time Pharmacy between November 5, 2010 and March 9, 2011 generated sales for the pharmacy of $334,221.71.

131.

From their inspections at both Olde Time Pharmacy locations, GDNA agents identified identified Noell and Sutherland as individuals who filled the prescriptions written by Garrett.

132.

Village Pharmacy is located at 3697 Highway 5, Douglasville, Georgia.

133.

In May 2011, GDNA Agent Margaret Brosh ("Agent Brosh") conducted a routine pharmacy inspection at Global Pharmacy.

134.

During the inspection, Agent Brosh interviewed the pharmacist, who stated that while he was filling a prescription for a pain clinic patient, he observed the patient drop a piece of paper on the floor of his pharmacy.

135.

The pharmacist retrieved the paper, which contained a list of Georgia pharmacies, including Village Pharmacy, that would fill prescriptions for out-of-state customers.

136.

Agent Brosh checked records on file with the GDNA and found that Village Pharmacy was last inspected on March 29, 2010 as a new store application.

137.

The investigation revealed that Village Pharmacy opened for business on July 1, 2010.

138.

On August 9, 2011, Agents Brosh and Troughton visited Village Pharmacy and met with the owner and Pharmacist In Charge, Chris Parker ("Parker"), and his wife, Christy Parker, who is also a licensed pharmacist.

139.

The agents reviewed various records for Village Pharmacy and found that Village Pharmacy was ordering and dispensing very high quantities of oxycodone.

140.

The agents also found that Village Pharmacy had filled over 1300 prescriptions for oxycodone 30mg from June 2010 through July 2011 (i.e., thirteen months).

141.

The agents reviewed the patient addresses and found that from June 2010 through January 2011, Village Pharmacy was filling prescriptions that customers had obtained at Florida pain clinics and that 99% of the prescriptions filled at the pharmacy were for customers in states other than Georgia.

142.

Parker told the agents that Village Pharmacy stopped filling narcotic prescriptions from the Florida clinics after he learned that one of the Florida doctors had been arrested.

143.

Agents also found that while Village Pharmacy was filling prescriptions from multiple pain clinics, the highest number of prescriptions filled from Georgia pain clinics were prescriptions that had been issued by Garrett of Better Living Center with the

second highest number being issued by Beard, who was then working as a doctor at Atlanta Counseling.

144.

From their review of the records, the agents found that Village Pharmacy dispensed 2,931 prescriptions written by Garrett between October 7, 2010 and July 2011, a period of approximately nine months, and dispensed 1,320 prescriptions written by Beard between February and July 2011, a period of approximately five months. By comparison, from June 2010 through July 2011 (i.e., approximately thirteen months), Village Pharmacy dispensed a combined total of only 171 prescriptions for all other Georgia pain clinics.

145.

The records also revealed that the 2,931 prescriptions written by Garrett and filled by Village Pharmacy between October 7, 2010 and July 2011 generated sales for the pharmacy of $903,094 and that the 1,329 prescriptions written by Beard and filled by Village Pharmacy between February and July 2011 generated sales for the pharmacy of $411,602.

146.

During their investigation, the agents learned that Village Pharmacy was initially charging its customers $1 per tablet of

oxycodone 30mg and that by the end of September 2010, it was charging $3.50 per tablet.

147.

From December 2010 through July 2011, Village Pharmacy charged its customer $5 per tablet of oxycodone 30mg and $4 per tablet of oxycodone 15mg.

148.

During an interview with the Agents Brosh and Troughton, Parker stated that he had visited Better Living Center and had met with Benton.

149.

Parker further stated that he will not accept more than $500 in cash for prescriptions that Village Pharmacy fills and that he tells customer to go to Wal-Mart to get a pre-paid Visa or MasterCard for any amount over $500.

150.

Parker further stated that he went to pharmacy school with Noell, that Noell also required the pre-paid Visa or MasterCard payments at his pharmacy, Olde Time Pharmacy, and that he was aware that the agents had recently been to Olde Time Pharmacy.

151.

From his investigation, Task Force Officer Manning identified numerous bank accounts associated with Better Living Center,

38

Atlanta Counseling, D&B Pharmacy, Mountainview Pharmacy, Village Pharmacy, Olde Time Pharmacy, and Olde Time Pharmacy at Sixes, including, but not limited to the following:

(a) Bank of America account number XXXXXXXX4760 held in the name of D&B Pharmacy ("BOA 4760");

(b) Wells Fargo Bank account number XXXXXX6830 held in the name of Village Pharmacy Inc. ("Wells Fargo 6830");

(c) Wells Fargo Bank account number XXXXXXXXXX5150 held in the name of Village Pharmacy Inc. ("Wells Fargo 5150");

(d) Delta Community Credit Union account number XXXXXX4497 held in the name of Old Time Pharmacy Inc. ("Delta 4497");

(e) Delta Community Credit account number XXXXXX5655 held in the name of Old Time Pharmacy Inc. ("Delta 5655");

(f) Wells Fargo Bank account number XXXXXX7930 held in the name of Ajueyitsi Holdings DBA D&B Pharmacy ("Wells Fargo 7930"); and

(g) SunTrust Bank account number XXXXXXXXX5485 held in the name of Atlanta Counseling & Recovery Center, LLC ("SunTrust 5485").

152.

From their investigation, agents learned that Romero is a resident of Texas and is currently using the address of 2302 Dryden Road, Houston, Texas ("Romero's residence").

153.

DEA agents in Houston obtained registration information for vehicles registered at Romero's residence, and they learned that Romero had several high-end vehicles registered in his name at that property, including the Defendant Range Rover, which Romero purchased on or about March 2, 2011, and the Defendant Jaguar.

154.

On several occasions during this investigation, agents observed Romero drive the Defendant Jaguar to or from Better Living Center, or park the vehicle at the clinic.

155.

During the investigation, agents found Currency Transaction Reports associated with Romero, using a Ft. Lauderdale, Florida address that was near the pain clinics in Florida that Benton owned.

156.

Bank records show that Romero had over $1,138,000 pass through (i.e., move into and then out of) his bank accounts from January 29, 2010 through March 22, 2011.

157.

Agents also found banking records that showed multiple deposits of over $20,000, each made to Romero's accounts at ATM machines in Ft. Lauderdale, Florida during the time that the Ft. Lauderdale pain clinics were operational.

158.

In addition, bank records show that from August 2010 through March 2011, which is after Benton closed his Florida clinics and while he was working as the office manager at Better Living Center, Romero deposited $434,320 in cash into his personal bank account, which is consistent with Better Living Center's cash-only policy.

159.

Benton is the owner of the Defendant Motorcycle, which he purchased on or about May 4, 2011, approximately eight months after he closed his Florida clinics.

160.

During the investigation, agents observed Benton arrive at Better Living Center on the Defendant Motorcycle and park it there.

161.

From their investigation, agents identified the Defendant Mercedes, which is registered in the name of D&B Pharmacy at the pharmacy's business location address.

162.

During surveillance, agents observed on the Defendant Mercedes a magnetic sign advertising D&B Pharmacy.

163.

Throughout the investigation, agents observed Wills driving the Defendant Chevrolet to, and parking it at, Better Living Center.

164.

On or about November 15, 2011, a grand jury in DeKalb County, Georgia, returned an indictment charging Benton, Garrett, Curtis Wills, Malcolm Garrett, Noell, Sutherland, Parker, Christie Parker, Monyei, Romero, Ajueuitsi, and Ukoh with violations of the Georgia RICO Act for their involvement in the distribution of Schedule II narcotics connected to Better Living Center and Atlanta Counseling.

165.

That same day, Task Force Officer Manning obtained search warrants for 18 separate locations, including the following:

(a)   4684 Roswell Road, Atlanta, Georgia, which is the business location of Atlanta Counseling;

(b)   3324 Peachtree Road, NE, Unit 3012, Atlanta, Georgia, which is a residence maintained by Benton ("Benton's residence");

42

(c)   3325 Piedmont Road, NE, Suite 1701, Atlanta, Georgia, which is a residence maintained by Wills ("Wills' residence");

(d)   5020 Guilford Forest Drive, Atlanta, Georgia, which is the residence of Ajueyitsi ("the Ajueyitsi's residence");

(e)   80 Mayflower Court, Dallas, Georgia, which is the residence of Ukoh ("Ukoh's residence");

(f)   3697 Highway 5, Douglasville, Georgia, which is the business location of Village Pharmacy;

(g)   684 Sixes Road, Holly Springs, Georgia, which is the business location of Olde Time Pharmcy at Sixes;

(h)   2327 Windy Hill Road, SE, Marietta, Georgia, which is the business location of Mountainview Pharmacy;

(i)   402 Argonne Terrace, Holly Springs, Georgia, which is the business location of Olde Time Pharmacy; and

(j)   3311 Highway 5, Suite D, Douglasville, Georgia, which is the business location of D&B Pharmacy.

166.

That same day, DEA agents in Houston, Texas obtained a search warrant for Romero's residence in Houston, Texas.

167.

On November 15, 2011, agents in Georgia and Texas executed all of the above-referenced search warrants.

43

168.

From Ajueyitsi's residence, agents seized the Defendant $148,967 and the Defendant Infiniti.

169.

From Ukoh's residence, agents seized the Defendant $45,000.

170.

From Village Pharmacy's business location, agents seized the Defendant $14,303, the Defendant Veracruz, and the Defendant Toyota.

171.

The agents also seized from Village Pharmacy's business location bank statements for Wells Fargo Bank account numbers XXXXXX6830 ("Wells Fargo 6830") and XXXXXXXXXX5150 ("Wells Fargo 5150"), both of which are held in the name of Village Pharmacy Inc. and appear to show business deposits and expenses being paid from the accounts.

172.

From Benton's residence, agents seized the Defendant $9,000.

173.

From Wills' residence, agents seized the Defendant $5,260.

174.

From Olde Time Pharmacy at Sixes' business location, agents seized the Defendant $2,838.

44

175.

From Mountainview Pharmacy's business location, agents seized the Defendant $1,445.

176.

The agents also seized from Mountainview Pharmacy's business location banking paperwork, including deposit tickets showing deposits into Bank of America account number XXXXXXXX1751 held in the name of Sunrise Enterprises Inc. DBA Mountainview Pharmacy ("BOA 1751").

177.

From Old Time Pharmacy's business location, agents seized the Defendant $1,086 and the Defendant Ford.

178.

From D&B Pharmacy's business location, agents seized the Defendant Mercedes.

179.

Agents also seized from D&B Pharmacy's business location a checkbook for Bank of America account number XXXXXXXX4760 held in the name of held in the name of David Ajueyitsi DBA D&B Pharmacy ("BOA 4760"), which appeared to show business expenses, including checks written to drug distribution companies, and bank statements for Wells Fargo Bank account numbers XXXXXX9845 ("Wells Fargo 9845"), and XXXXXX7390 ("Wells Fargo 7390"), which are "Advantage

Business" accounts held in the name of Ajueyitsi Holdings DBA D&B Pharmacy.

180.

From Romero's residence in Texas, agents seized $565,000 in United States currency, the Defendant Range Rover, the Defendant Jaguar, and the Defendant Assorted Electronic Equipment, which is more specifically identified as follows:

(a)   one 32gb iPad, SN GB049S9TETU;

(b)   one 64gb iPad, SN DLXFMV2XDKNY;

(c)   one 64gb iPad, SN J3045K59ETV;

(d)   one 64gb iPad, SN DLXFFBVEDKNY;

(e)   one 64gb iPad, SN GB026A14ETV;

(f)   one Macbook Pro laptop, SN W89238748YA;

(g)   one Macbook Pro laptop, SN W894514J8YA;

(h)   one Apple iMac computer, SN YM83385DZE4.

181.

During the search of Romero's residence, agents also located a Certificate of Title for the Defendant Boat, which was hidden behind a picture frame that was hanging on the wall in the residence.

46

182.

From Atlanta Counseling's business location, agents seized the Defendant $25,060, the Defendant Genesis, and the Defendant Chevrolet.

183.

At the time he executed the search warrant at Atlanta Counseling, Task Force Officer Manning interviewed Brandi Hyde ("Hyde"), who is a pharmacy technician and medical assistant at the clinic.

184.

During the interview, Hyde told Task Force Officer Manning that one of her daily duties was to call certain pharmacies to verify that those pharmacies had oxycodone in stock.

185.

According to Ms. Hyde, the pharmacies she called on a daily basis included Olde Time Pharmacy, Olde Time Pharmacy at Sixes, D&b Pharmacy, and Village Pharmacy.

186.

Ms. Hyde further stated that when she called Village Pharmacy, she talked to either "Chris" or "Christy," who she described as a married couple and the pharmacists at the location.

187.

On November 16, 2011, Task Force Officer Manning obtained
federal seizure warrants for, among other things, the Defendant
Genesis, the Defendant Chevrolet, the Defendant Mercedes, the
Defendant Motorcycle, the Defendant Jaguar, the Defendant Range
Rover, and numerous bank accounts, including, but not limited to,
BOA 1751, BOA 4760, Delta 5655, Delta 4497, SunTrust 5485, Wells
Fargo 9845, Wells Fargo 7930, Wells Fargo 6830, and Wells Fargo
5150.

188.

On November 17, 2011, agents executed the seizure warrants for
BOA 1751, Delta 5655, Delta 4497, SunTrust 5485, Wells Fargo 9845,
Wells Fargo 7930, Wells Fargo 6830, and Wells Fargo 5150 and seized
the Defendant $71,016.23, the Defendant $36,312.28, the Defendant
$5,750.71, the Defendant $200,132.64, the Defendant $79,562.35, the
Defendant $60,260.34, and the Defendant $30,828.70.

189.

SunTrust Bank did not turn over any funds for SunTrust 5485 at
that time, and the agents returned the seizure warrant to the
magistrate court as unexecuted.

190.

On November 17, 2011, after agents reviewed paperwork and
other evidence seized during the execution of the various search

48

warrants, Task Force Officer Manning obtained federal seizure
warrants for the following additional bank accounts:

    (a)   Delta Community Credit Union account number XXXXXX8148
        held in the name of Richard P. Noell ("Delta 8148");

    (b)   Delta Community Credit Union account number XXXXXX6369
        held in the name of Shad Sutherland ("Delta 6369"); and

    (c)   Bank of America account number XXXXXXXX1769 held in the
        name of Sunrise Enterprises DBA Mountainview Pharmacy
        Expense Account ("BOA 1769").

191.

On November 18, 2011, agents executed the seizure warrants for
BOA 4760, BOA 1769, Delta 6369, and Delta 8148 and seized the
Defendant $54,884.43, the Defendant $3,759.23, the Defendant
$24,139.41, and the Defendant $8,429.25.

192.

Agents were unable to locate the Defendant Motorcycle, and as
a result, Task Force Officer Manning served it on Benton's
attorney.

193.

On January 13, 2012, Benton delivered the Defendant Motorcycle
to the DEA offices located at 1433 West Loop South, Houston, Texas, and
agents seized it pursuant to the seizure warrant.

194.

As part of his investigation, Task Force Officer Manning contacted the Texas Parks and Wildlife Department concerning the Defendant Boat.

195.

According to the Texas Parks and Wildlife Department, Romero purchased the Defendant Boat on or about December 17, 2009, i.e., at the time he was operating his Florida pain clinics, for $165.000.

196.

Records also show that Romero paid $12,004.09 in taxes to the State of Texas and another $9,900 in taxes to the State of Florida, which is where Romero purchased the Defendant Boat.

197.

In January 2012, Task Force Officer Manning learned that SunTrust Bank had actually frozen SunTrust 5485 on or about November 17, 2011 and that it held $7,780.51.

198.

On January 20, 2012, Task Force Officer Manning obtained federal seizure warrants for SunTrust 5485 and the Defendant Boat.

199.

On January 20, 2012, Task Force Officer Manning executed the seizure warrant for SunTrust 5485 and seized the Defendant $7,780.51.

200.

On or about January 26, 2012, agents in Texas executed the seizure warrant for the Defendant Boat and seized it from 827 Gulf Road, Surfside Beach, Texas.

201.

All of the above-listed Defendant properties are subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) on the grounds that they were furnished or intended to be furnished in exchange for a controlled substance, that they constitute proceeds traceable to such an exchange, or they were used or intended to be used to facilitate the sale or exchange of a controlled substance.

202.

The Defendant Mercedes, the Defendant Jaguar, the Defendant Chevrolet, the Defendant Motorcycle, the Defendant Genesis, the Defendant Veracruz, the Defendant Ford, and the Defendant Toyota are also subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(4), because they were used, or was intended to be used, to transport or facilitate the transportation, sale, receipt, possession, or concealment of a controlled substance.

WHEREFORE, Plaintiff prays:

    (1)   that the Court forfeit all of the above-listed Defendant properties to the United States of America;

    (2)   that the Court award Plaintiff the costs of this action; and

    (3)   that Plaintiff have such other and further relief as the Court deems just and proper under the facts and circumstances of this case.

This _12th_ day of March, 2012.

Respectfully submitted,

SALLY QUILLIAN YATES
UNITED STATES ATTORNEY

MICHAEL JOHN BROWN
ASSISTANT UNITED STATES ATTORNEY
Georgia Bar No.: 064437

600 United States Courthouse
75 Spring Street, S.W.
Atlanta, GA 30303
(404) 581-6131 - Phone
(404) 581-6234 - Fax
michael.j.brown2@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,                    :
                                             :
        Plaintiff,                           :
                                             :
             v.                              :
                                             :
$148,967.00 IN UNITED STATES                 :
CURRENCY; $45,000.00 IN UNITED               :
STATES CURRENCY; $25,060.00 IN               :
UNITED STATES CURRENCY;                      :
$14,303.00 IN UNITED STATES                  :
CURRENCY; $9,000.00 IN UNITED                :
STATES CURRENCY; $5,260.00 IN                :
UNITED STATES CURRENCY;                      :     CIVIL ACTION
$2,838.00 IN UNITED STATES                   :
CURRENCY; $1,445.00 IN UNITED                :
STATES CURRENCY; $1,086.00 IN                :
UNITED STATES CURRENCY;                      :     NO._____
$54,884.43 IN FUNDS SEIZED                   :
FROM BANK OF AMERICA ACCOUNT                 :
XXXXXXXX4760; $5,750.71 IN                   :
FUNDS SEIZED FROM BANK OF                    :
AMERICA ACCOUNT XXXXXXXX1751;                :
$3,759.23 IN FUNDS SEIZED                    :
FROM BANK OF AMERICA ACCOUNT                 :
XXXXXXXX1769; $71,016.23 IN                  :
FUNDS SEIZED FROM DELTA                      :
COMMUNITY CREDIT UNION ACCOUNT               :
XXXXXX5655; $36,312.28 IN FUNDS              :
SEIZED FROM DELTA COMMUNITY                  :
CREDIT UNION ACCOUNT XXXXXX4497;             :
$24,139.41 IN FUNDS SEIZED                   :
FROM DELTA COMMUNITY CREDIT                  :
UNION ACCOUNT XXXXXX6369;                    :
$8,429.25 IN FUNDS SEIZED FROM               :
DELTA COMMUNITY CREDIT UNION                 :
ACCOUNT XXXXXX8148; $7,780.51                :
IN FUNDS SEIZED FROM SUNTRUST BANK :
ACCOUNT XXXXXXXXX5485;                       :
$200,132.64 IN FUNDS SEIZED                  :
FROM WELLS FARGO BANK ACCOUNT                :

```
XXXXXX6830; $79,562.35 IN          :
FUNDS SEIZED FROM WELLS FARGO      :
BANK ACCOUNT XXXXXXXXX5150;        :
$60,260.34 IN FUNDS SEIZED         :
FROM WELLS FARGO BANK ACCOUNT      :
XXXXXX9845; $30,828.70 IN          :
FUNDS SEIZED FROM WELLS FARGO      :
BANK ACCOUNT XXXXX7390; 2011       :
LAND ROVER RANGE ROVER,            :
VIN SALMF1E42BA341598; 2011        :
HARLEY DAVIDSON FLSTC MOTORCYCLE,  :
VIN 1HD1BW515BB040308; 2010 HYUNDAI:
GENESIS, VIN KMHGC4DE7AU092202;    :
2008 INFINITI FX35,                :
VIN JNRAS08UX8X103144;             :
2007 CHEVROLET SUBURBAN,           :
VIN 3GNFC16067G287887; 2007 HYUNDAI:
VERACRUZ, VIN KM8NU13C27U007942;   :
2007 JAGUAR XKR,                   :
VIN SAJWA44C779B13134;             :
2007 MERCEDES BENZ GL450,          :
VIN 4JGBF71E47A190606;             :
2004 FORD F-250,                   :
VIN 1FTNX21P44ED68523;             :
2003 TOYOTA 4RUNNER,               :
VIN JTEBU14RX30014094;             :
2006 MIDNIGHT EXPRESS OPEN         :
VESSEL, HULL ID 37009,             :
WITH THREE 2006 MERCURY MOTORS,    :
SERIAL NUMBERS 1B258029,           :
1B256966, AND 1B245462; AND        :
ASSORTED COMPUTER EQUIPMENT,       :
                                   :
          Defendants.              :
```

## VERIFICATION OF COMPLAINT FOR FORFEITURE

I, Task Force Officer William J. Manning, have read the Complaint for Forfeiture in this action and state that its contents are true and correct to the best of my knowledge and belief.

54

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

This _12_ day of March, 2012.

TASK FORCE OFFICER WILLIAM J. MANNING
DRUG ENFORCEMENT ADMINISTRATION